IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JOHN ALAN ELLIS                                              PLAINTIFF

V.                                      NO. 11-5146

DEPUTY MICHAEL EUGENE CHAMBERS,
DEPUTY MICHAEL SCOTT MCCRANIE, AND
DEPUTY JUSTIN ROBERT CRANE                                   DEFENDANTS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This is a civil rights action filed by the Plaintiff, John Alan Ellis, pursuant to 42 U.S.C.

§ 1983.  Plaintiff proceeds *pro se* and *in forma pauperis*.  He has sued the following Defendants

in both their individual and official capacities:  Benton County Detention Center (BCDC)

Deputies Michael Eugene Chambers, Michael Scott McCranie, and Justin Robert Crane.

Plaintiff is currently incarcerated in the Arkansas Department of Correction (ADC),

Cummins Unit, in Grady, Arkansas.  The events at issue in this case occurred while Plaintiff was

in pre-trial status at the BCDC from April 6, 2010, to November 30, 2011.  Specifically, Plaintiff

maintains that he was subjected to excessive force by Defendants Chambers, Crane, and

McCranie on May 14, 2011, while being transported to lock-down and the nurse's station, and

while being forcibly placed in a suicide smock.  Defendants have demanded a jury trial and have

filed a Partial Motion for Summary Judgment (Doc. 32),[1] arguing that Plaintiff's claims against

Defendant Chambers in his individual capacity should be dismissed and that Plaintiff's claims

---

[1]Defendants did not raise a failure to exhaust administrative remedies argument in their summary judgment motion.  Upon inquiry into this issue at the hearing, Defendants advised the undersigned that they were waiving this argument.

-1-

against all Defendants in their official capacities should be dismissed.  On April 10, 2012, a pretrial evidentiary hearing was held to determine if any issues triable to a jury exist.

## I. **Background and Evidence Presented:**

At the hearing, Plaintiff and the three named Defendants testified.  The witness testimony and evidence presented will be summarized below.

### A. **Plaintiff John Alan Ellis' Testimony:**

1.  Plaintiff testified that on the morning of May 14, 2011, the day in question, he was in D-130 pod, and had asked the nurse if he could lie down, because of abdominal pain he was experiencing.  Defendant McCranie later told Plaintiff that he was not allowed to be on bed rest. Plaintiff was in pod control trying to talk to Defendant McCranie to tell him he did not feel well, when Defendant McCranie instructed him to go back to the pod and then grabbed him and threw him back into D-Pod  Plaintiff acknowledged at the hearing that this conduct did not constitute excessive force.

At around 10 am that same morning, when Plaintiff went to get his noon medications, he told Deputy Wright that Defendant McCranie would not get away with putting his hands on someone on the streets like that.  Plaintiff then said, "Fuck McCranie."  Upon hearing this, Defendant Chambers told Plaintiff to get up against the wall.  Plaintiff told Defendant Chambers that he was there to get his medications, and Defendant Chambers told Plaintiff he would receive his medications last.  Plaintiff then wanted to refuse his medications and go back to his pod, at which time Defendant Chambers grabbed Plaintiff and told him he was going to lock-down. Deputy Wright and Defendant Chambers then proceeded to escort Plaintiff to E-pod.  Defendant Chambers put Plaintiff's arm up behind the middle of his back, which hurt Plaintiff's shoulder

AO72A
(Rev. 8/82)

and caused him to drop to his knees on the ground because of the pain.  Plaintiff acknowledged, however, that he did not believe Chambers used excessive force in placing his arm behind his back.  Defendant Chambers and Deputy Wright helped Plaintiff get up, and continued to escort him down the hallway.  Defendant Crane then approached Plaintiff, Defendant Chambers, and Deputy Wright as they were walking along the hallway on their way to the control booth, and Plaintiff told Defendant Crane that his shoulder hurt.  According to Plaintiff, Defendant Crane then grabbed his right arm and bent his right wrist down, to the point that it brought tears to Plaintiff's eyes.  Defendant Crane asked Plaintiff if that hurt.  Plaintiff then became a little belligerent.  Plaintiff contends that excessive force was used by Defendant Crane when he bent Plaintiff's right wrist down.  Plaintiff acknowledged that when Defendant Crane grabbed his hand from Chambers, Plaintiff might have moved his arm and shoulder to get his shoulder from hurting, or "to get a kink out of it."   Plaintiff also admitted that he did not know if he was making threats at that time, but that it "may be" possible.  He did not recall threatening to head-butt Crane.  The deputies placed Plaintiff up against the wall, and tried to talk to him.

2.  Plaintiff testified that while standing at the wall, he was upset and raising his voice, and that everyone was yelling.  He stated that he slammed his head against the wall two times to try to calm himself down or else he would have "done something to somebody."  Plaintiff stated that Defendant Crane and Defendant McCranie then "picked me up and slammed me on my belly" onto the floor, and handcuffed him at that time, because Defendant Crane said Plaintiff was hurting himself.  Upon inquiry by the Court, and after watching the video of the incident (Defs.' Ex. 3),  Plaintiff agreed that it did appear that he went to the ground first on his buttocks and was then turned over onto his belly.  Plaintiff also conceded, after hearing the testimony of

the witnesses and watching the video, that Defendant McCranie was not involved in taking Plaintiff to the ground.  Plaintiff stated that he received a black eye while he was on his belly on the ground.

3.  Plaintiff stated that after he got up from being placed on his stomach, he was then escorted by Defendants Crane and McCranie to the nurse's station.  On the way to the nurse's station, Plaintiff contends that Defendant McCranie bent his left wrist, which was handcuffed behind him, at which time Plaintiff dropped to his knees.  Plaintiff contends that Defendant McCranie's conduct at this point constituted excessive force, and that his wrist was bruised for a week and a half as a result of being bent by Defendant McCranie.  Plaintiff testified that he was not resisting at that point.

4.  After arriving at the nurse's station, the nurse said Plaintiff's wrists were okay, even though they were both swollen, and said to take him back to his cell and give him Tylenol and ice packs for his wrists.

5.  Plaintiff testified that after leaving the nurse's station, Defendants Crane and McCranie escorted him to cell E-104 and advised him that he was going to be placed in a suicide smock.  Plaintiff told them that he was not going to wear the smock because he did not believe he needed to be placed in it.  Plaintiff stated that after he refused to put the smock on, Defendants Crane and McCranie held him against the wall;  picked him up off the ground about three feet and jerked his pants off;  moved him to the right of the cell, where he got thrown onto a table and landed on his right wrist, further injuring it; and then sat him back up and took his shirt off.  Plaintiff admitted that he was belligerent and resisting, "but not more than anyone else would be."  When asked why the Defendants moved him over to the table, Plaintiff acknowledged that

-4-

he was "probably wiggling," and that he was probably making it more difficult for them to put the smock on him.  Deputy Wright and Defendant Chambers were also present in cell E-104. Plaintiff  testified that later, Defendant Crane said he would talk to Defendant McCranie about getting him out of the smock, and that Deputy McCranie told him on Saturday that if he did not do anything else to hurt himself, he would be back on Wednesday, and would then let him out of the smock.  Plaintiff did not think he beat on the door after they left the cell.  Plaintiff was let out of the smock on Wednesday afternoon.

6.  Plaintiff testified that he went to the doctor on the Monday after the incident, and x-rays were taken of his hands on Tuesday.  A brace was put on his right wrist on Wednesday.  An x-ray of Plaintiff's right wrist revealed a non-displaced fracture.  (Pl.'s Ex. 3).  An x-ray of his left wrist revealed no fracture or dislocation.  (Id.).  An x-ray of Plaintiff's right wrist taken approximately one month later revealed that Plaintiff's wrist had healed.  (Id.).

7.  Plaintiff stated that with respect to Defendant Crane, there were three instances where he believed Defendant Crane used excessive force against him: 1) when Crane bent his right wrist down before placing him up against the wall;  2) when Crane "slammed" him to the ground;  and 3) when Crane was attempting to put the suicide smock on Plaintiff.

8.  Plaintiff stated that with respect to Defendant McCranie, there were two instances where he believed Defendant McCranie used excessive force against him: 1) when Defendant McCranie bent his wrist as they walked to the nurse's station; and 2) when Defendant McCranie was attempting to put the suicide smock on Plaintiff.

9.  Plaintiff stated that he included Defendant Chambers in the action because the whole incident would not have happened if Chambers had just given Plaintiff his medications and let

AO72A
(Rev. 8/82)

him go back into the pod.  Plaintiff conceded that Defendant Chambers was not responsible for any of the alleged excessive force used against him and that Chambers should be dismissed from the action.

10.  Plaintiff contends that as a result of the above actions by Defendants Crane and McCranie, his right wrist was fractured, he suffered a black eye, and suffered a bruise on the bottom of his left wrist.  He stated that his right wrist bothered him for about three to four weeks; his left wrist bothered him for about 1 ½ weeks;  and that his wrists were swollen for about four to five days.  Plaintiff testified that he could use his wrists like he could prior to the incident.

11.  Plaintiff admitted that he was upset and resisted Defendants at times, but he believed his resistance was justified.

**B. Defendant Chambers' Testimony:**

12.  Defendant Chambers stated that on the day of the incident, he was  acting as Detention Deputy, and Plaintiff came to pod control to receive his medication.  According to Defendant Chamber's report:

> Inmate Ellis came to Pod control and was being belligerent, then made the statement "Fucking Sgt. McCranie, if I see him on the outside I will take care of him."  I ordered Inmate Ellis to stop making threats towards deputies.  Inmate Ellis continued to be belligerent, stating "Fuck you, just give me my meds."  I ordered Inmate Ellis to stand by D-130 door.  Inmate Ellis did not comply.  I told Inmate Ellis he was going to lock down.  Inmate Ellis stated "No I am not, I am going back in D-130."

(Pl.'s Ex. 1).   Defendant Chambers took hold of Plaintiff at that time to take him to administrative segregation - E-pod - and Plaintiff started pulling away.  Plaintiff then became somewhat cooperative, but then began pushing back, at which time Deputy Wright came to help.  Deputy Wright and Defendant Chambers continued to escort Plaintiff down the hallway.

-6-

Defendant Chambers testified that Plaintiff was verbally combative and not wanting to obey orders prior to this incident. (Pl.'s Ex. 1).

13. As Defendant Chambers, Deputy Wright, and Plaintiff were walking around the corner of the hallway on their way to E-pod, Plaintiff tried to drop to his knees ("passive resistance"). Deputy Wright and Defendant Chambers assisted him back up and Defendant Crane came to assist. According to Defendant Chambers' report:

> Once at E-pod Corporal Crain and Deputy Lebrault placed inmate Ellis in handcuffs. Inmate Ellis was still resisting and struck his head against the wall three times. Sergeant McCranie, Corporal Crain and I placed Inmate Ellis on the floor. ...

(Pl.'s Ex. 1).

Defendant Chambers testified that while Plaintiff was made to stand by the wall, the deputies were looking for a place to take Plaintiff, and that Plaintiff was continually making threats and cursing, saying he had been trained by a navy seal and he would "whip all our asses." Defendant Chambers testified that Plaintiff referred to them as "nigger deputies" and that most of his remarks were directed toward Defendant Chambers.

14. Defendant Chambers testified that Defendant Crane asked Defendant Chambers to step back, and when Plaintiff started to pull away, Defendant Crane then did a "transport wrist lock," where both hands were placed on the top of Plaintiff's right hand, and constant pressure was placed down on the hand, thereby pushing the hand down at the wrist. This technique was used in order to keep control of Plaintiff and to move him from one place to another. Defendant Chambers testified that the transport wrist lock is also an appropriate technique to use if someone is complaining about his shoulder hurting, as it releases the pressure from the shoulder.

15. Defendant Chambers testified that the reason Plaintiff was placed against the wall

-7-

was so he could not lunge at them or "attempt to do anything like that."  While Defendant Crane

was holding Plaintiff in position, handcuffs were placed on him.

16.  Defendant Chambers testified that while being held against the wall, Plaintiff started

banging his head against the wall, and the deputies became concerned that he was trying to injure

himself.  They then removed Plaintiff from the wall, and Defendant Crane, Deputy Wright, and

Deputy Lebrault placed Plaintiff onto the floor on his buttocks, and then flipped him over onto

his stomach.[2]

17.  Soon after Plaintiff was placed on the floor, Defendant McCranie was called in, and

after trying to obtain information from Plaintiff while he was on the floor, assisted Plaintiff up

from the floor.   As Plaintiff was complaining of a shoulder injury, Defendant McCranie and

Defendant Crane took Plaintiff to the nurse's station.  The nurse's notes reflect that Plaintiff only

complained of left wrist pain, that no swelling, abrasions, or lacerations were observed, and that

no popping or clicking occurred when Plaintiff moved his wrist "superior [and] inferior."  The

nurse recommended an ice pack.  (Pl.'s Ex. 3).

After taking Plaintiff to the nurse's station, Defendant McCranie made the decision to

place Plaintiff in a suicide smock, as Defendants were concerned for Plaintiff's safety.  Plaintiff

stated there was no way he was going to be placed in a suicide smock.  The  Plaintiff was again

placed up against the wall, with Defendant Chambers and Deputy Neal  holding him against the

wall. Plaintiff continued to resist, and argued about not wanting to put on the smock.  Plaintiff

was  then  taken  to  cell  E-104  in  order  to  be  placed  in  the  smock.   Defendants  Crane  and

---

[2]The Court notes that in Defendant Chambers' report, he said Defendant McCranie was involved in placing
Plaintiff on the floor.  However, at the hearing, Defendant Chambers testified that Defendants Crane, Deputy
Wright, and Deputy Lebrault were involved.   As noted above, the video of the incident reveals Defendant
McCranie was not involved in placing Plaintiff on the floor.

McCranie maintained control of Plaintiff by uncuffing him, holding onto his arms and placing his hands against the wall, while Defendant Chambers, Deputy Wright and Deputy Neal removed his clothing. Plaintiff continued to resist the attempts to put him in the smock. His shirt was removed first and the smock was placed on him and his pants were then removed. Defendant Chambers testified that Plaintiff did not get slammed around, that the room was small, and there were several individuals in the room. Once Plaintiff was placed in the smock, he was told to go to his knees at the back of the cell until all deputies exited, and Defendants Crane and McCranie were the last to exit the cell. Defendant Chambers never noticed anything happening to Plaintiff's wrist that could have caused a fracture.

### C. Defendant McCranie's Testimony:

18. Defendant McCranie was in charge of the shift on May 14, 2011. His first memory of the incident was when he happened to be in the hallway and one of the deputies radioed him, asking him to come and help. Defendant McCranie saw Plaintiff up against the wall in the hallway, and then being placed on his stomach on the floor. Defendant McCranie knelt down by Plaintiff and tried to talk with him in order to discern what was going on. Defendant McCranie testified that Plaintiff was cursing and quite upset, his face was red, and he was clinching his teeth and squirming on the floor. There were a significant number of deputies trying to hold him still, and Defendant McCranie wanted to see if he could diffuse the situation. Plaintiff was complaining about Defendant Chambers, and said his shoulder and wrist were hurting. Defendant McCranie testified that anyone who had been taken to the ground or complained of medical injury was taken to the nurse's station. Therefore, as standard protocol, Defendants McCranie and Crane escorted Plaintiff to the nurse's station. Defendant McCranie

-9-

stated that Plaintiff's hands were behind his back in handcuffs when they escorted him to the nurse's station. Plaintiff continued to make threats and was behaving in a belligerent fashion, and tried to drop to his knees, at which time Defendant McCranie bent Plaintiff's left wrist down, in order to maintain control of his hand to provide "pain and compliance" in the event it was needed. This technique was described as being used when wanting to put someone in a non-painful position in order to be prepared to cause pain. Defendant McCranie saw no visible injuries on Plaintiff.

19. After Plaintiff saw the nurse, Defendants McCranie and Crane then escorted Plaintiff back to E-Pod, and Defendant McCranie decided they should place him in a suicide smock, because he had banged his head against the wall and because of the level of anger he displayed. Defendant McCranie further testified that there were two purposes for the smock: suicide prevention and to keep an inmate from tearing things up. Defendant McCranie testified that he was hoping to calm Plaintiff down, and talked to him at length. Defendant McCranie said they were working on finding a cell in which to place Plaintiff in order to put him in the smock, and Plaintiff was adamantly refusing to go into the smock, saying that if they tried to put him in the smock, he would "beat all their asses." Plaintiff made it clear that he would fight being placed in the smock.

20. When Plaintiff was taken to cell E-104, Defendant McCranie again asked Plaintiff to put the smock on himself, and Plaintiff made threatening comments again. Defendant McCranie stated that they then held him against the wall and again asked him to put the smock on. Plaintiff refused and was threatening violence, and did not calm down. According to Defendant McCranie, it took him, Defendant Chambers, Deputy Neal, Deputy LeBrault, and

Defendant Crane to restrain Plaintiff.  Defendant McCranie stated that Plaintiff may have made

contact with the table in the room.

21.  Defendant McCranie acknowledged that he did not file a report of this incident, and

that it was out of the ordinary for him not to do so.  He did not know if he did not prepare a

report or if it became lost in an old computer software system.  Defendant McCranie also

testified that he had been accused of one prior incident of using excessive force and he was sent

for criminal justice institute educational training as a result.

22. Defendant McCranie testified that he was aware that Defendant Crane had previously

been found by his supervisors to have used excessive force in one instance, where he used a

pressure point on someone, which was determined to be inappropriate.

**D.  Defendant Crane's Testimony:**

23.  Defendant Crane testified that he was told by defense counsel the night before the

hearing that they could not find his report of the incident in the jail file.  Defendant Crane looked

for and found a "back-up report," which was the same as the official report, which he always

kept, and testified that the report should have been in the jail file.  Defendant Crane testified that

he first typed the incident up, and would have copied it and pasted it into the "Blue Team"

report.[3]  For some reason, the report did not appear in the jail file.

24.  Defendant Crane testified that on May 14, 2011, he was in the nurse's station

performing his normal duties, and heard yelling in the hallway.  He saw Defendant Chambers

and Deputy Wright escorting Plaintiff down the hallway, and saw Plaintiff leaning back and

pushing against them.  Defendant Crane then approached them and continued to walk behind

---

[3]"Blue Team" software was used for a few months, but is no longer used in the jail.

them as they walked down the hallway.  He stated that Plaintiff seemed agitated and was belligerent and cursing, which appeared to be directed against Defendant Chambers.  Once at the end of the hallway, Defendant Crane took over control of Plaintiff's right arm from Defendant Chambers, and as he reached behind Plaintiff, Plaintiff began to pull his right arm around.  Defendant Crane then applied a "transport wrist lock" on Plaintiff.

Defendant Crane testified that Plaintiff said his shoulder was hurt, which was why he used the transport wrist lock.  Defendant Crane admitted that he asked Plaintiff, "Does this hurt?"  Defendant Crane explained that he was referring to Plaintiff's shoulder, because he had heard Plaintiff complaining of his shoulder hurting and he was trying to put Plaintiff's shoulder in a neutral position.  Plaintiff was still yelling, making racial comments, called Defendant Chambers a "nigger deputy," was shifting back and forth, and tensed up his upper right arm when Defendant Crane had him in the wrist lock.  Defendant Crane then placed Plaintiff up against the wall and handcuffed him.  Plaintiff kept trying to turn toward Defendant Crane.  As Plaintiff kept turning his head and shoulders, Defendant Crane applied more pressure.  Defendant Crane put both of his hands against Plaintiff's back so Plaintiff could not turn.  Plaintiff told Defendant Crane that he felt like head-butting Defendant Crane.  According to Defendant Crane, Plaintiff hit the wall two times with his head, and then Defendant Crane pulled him back and placed him onto the floor on his buttocks, and then rotated him around onto his stomach.  Once to the ground, Defendant Crane had his right arm across Plaintiff's shoulder blades and his left hand on top of Plaintiff's head to prevent his head from moving about and banging his head on the floor.  Defendant McCranie came around at that time and spoke to Plaintiff, who was still very agitated.  Plaintiff said he wanted to go to the nurse.

-12-

25. Defendant Crane and Defendant McCranie then took Plaintiff to the nurse's station, as Plaintiff stated that his left wrist hurt.   While being examined, Plaintiff's handcuffs were removed.  The nurse said Plaintiff could have ice packs if he wanted them.

26.   While transporting Plaintiff from the nurse's station to E-pod, Plaintiff was still belligerent and angry at Defendant Chambers.  At one point, Defendant McCranie told Plaintiff he was going to have to wear a suicide smock, and they proceeded to a cell where Plaintiff could put on the smock.  Defendants McCranie and Crane were leading the way, and Defendant Chambers and Deputy Neal were behind them as they went to cell E-104.  Plaintiff stated that he was "not wearing a fucking dress."   Defendant McCranie told Plaintiff to calm down,  and continued to talk to him about why he was going to wear a smock.  Plaintiff stayed agitated. Defendant McCranie told him he was going to have to wear it, and Plaintiff did not calm down. Defendant McCranie and Defendant Crane then held Plaintiff up against the wall to place him in the smock.  Plaintiff was in handcuffs behind his back, and while he was trying to move around, Plaintiff's pants and boxers were removed.  Plaintiff's handcuffs were removed to put the smock over his head, and the handcuffs were then put back on.  Plaintiff was kicking around the whole time, and made a move toward the table that was in the room to allude their control. Plaintiff ended up on the table, but was not slammed up against the table.  After placing Plaintiff in the smock, Defendants left and shut the door of the cell.  Plaintiff began kicking and screaming, and Defendant Crane told him outside the door that if he continued, he would be placed in five-point restraints.  Plaintiff thereafter sat down on the bench.

27. Defendant Crane testified that the pressure he placed on Plaintiff's wrist when he first approached Plaintiff in the hallway was not hard enough to fracture his wrist, and Defendant

-13-

Crane did not recall ever seeing a black eye on Plaintiff, either during or after the incident. Defendant Crane testified that Plaintiff may have had a mark on his forehead from when he hit his head against the wall, but he did not have a black eye.

28.   During the course of the hearing, the Court asked Defendants to submit, in camera, any documents contained in the files of Defendants McRanie and Crane, relating to any use of excessive force by them.  In response, the Court received documents[4] which relate to an incident that occurred in November of 2010, between another inmate and Defendant Crane.  As a result of that incident, Defendant Crane was required to attend remedial training at the Criminal Justice Institute, was assigned to central control for 30 days, and was advised that any further violation of policy would result in disciplinary action, up to termination.  Defendant Crane has had no subsequent disciplinaries for excessive force since that time.

## II.  Applicable Standard:

A pretrial evidentiary hearing may be utilized to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Johnson v. Bi-State Justice Center, 12 F.3d 133, 135 (8th Cir. 1993)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  When both sides present evidence, the procedure "resembles a summary judgment motion with live evidence."  Johnson, 12 F.3d at 135.  The Court must avoid credibility determinations, believe the Plaintiff's evidence, and draw all justifiable inferences in the Plaintiff's favor.  Id. at 136.

---

[4]These documents will be admitted as Court's Exhibit 3.

**III. Discussion**:

Section 1983 provides a cause of action against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . .  subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.

Plaintiff was a pretrial detainee when he booked into the BCDC on April 6, 2010, and thus, his excessive-force claim is properly analyzed under the Due Process Clause of the Fourteenth Amendment.  See Graham v. Conner, 490 U.S. 386, 395 & n. 10 (1989).  Courts generally analyze excessive-force claims of pretrial detainees in the same way as those of arrestees.  See Andrews v. Neer, 253 F.3d 1052, 1060 (8th Cir. 2001)("The evaluation of excessive-force claims brought by pretrial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard").  The use of force must be necessary to some legitimate institutional interest, such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals.  See Johnson-El v. Schoemehl, 878 F.2d 1043, 1048 (8th Cir. 1989).  Force may be justified to make an inmate comply with a lawful order, but only if the inmate's noncompliance poses a threat to other persons or to prison security.  See Treats v. Morgan, 308 F.3d 868, 875 (8th Cir. 2002).

The Court begins with the question of whether the facts support Plaintiff's claims that Defendants violated his rights by using excessive force when: 1) Defendant Crane imposed a transport wrist lock on Plaintiff's right wrist when taking control of Plaintiff from Defendant Chambers; 2) Defendant Crane took Plaintiff to the ground; 3) Defendant McCranie applied

-15-

pressure against Plaintiff's left wrist while he was being escorted to the nurse's station; and 4) Defendant McCranie and Defendant Crane placed Plaintiff in a suicide smock.   The Court must view the facts in the light most favorable to the Plaintiff at this stage of the proceedings.   See Jones v. Shields, 207 F.3d 491, 492 (8th Cir. 2000).

**A.  Dismissal of Defendant Chambers:**

With respect to Defendant Chambers, Plaintiff conceded that there was no basis for liability against Defendant Chambers, and therefore, **the undersigned recommends that the motion for summary judgment be granted as to Defendant Chambers.**

**B.  First Incident  - When Defendant Crane administered transport wrist lock:**

Plaintiff contends that Defendant Crane used excessive force when he imposed a "transport wrist lock" on Plaintiff's right hand while Defendant Crane was taking control of Plaintiff from Defendant Chambers.  Plaintiff acknowledged that when Defendant Crane took his right arm, Plaintiff may have moved his arm and shoulder, and may have been making threats towards the deputies.  Defendant Crane gave a clear explanation as to why he asked Plaintiff "Does this hurt" when he applied the transport wrist lock.  Defendant Crane knew Plaintiff had complained of his shoulder hurting and Defendant Crane was making sure he was not hurting his shoulder.  The situation was clearly a volatile one, Plaintiff was acting in an aggressive, confrontational manner, and Defendant Crane was using an appropriate and reasonable level of force to obtain control of Plaintiff and restore order.  Cf. Wilson v. Stallard, No. 7:10CV00237, 2010 WL 3291798, at *8 (W.D. Va. Aug. 19, 2010)(In response to inmate turning around while being handcuffed, officer placed inmate in a wrist lock, causing a cut to inmate's wrist; court summarily dismissed inmate's excessive force claim, concluding, "Even if, in hindsight, the

-16-

amount of pressure applied in the wrist lock was not a 'perfectly measured' response to the degree of threat that [the inmate's] actions posed, the court must defer to [the officer's] determination that this hold was an appropriate means of restoring order"), aff'd, 403 Fed. Appx. 797 (4th Cir. 2010); Snodgrass v. Shasta County Detention Facility, No. CIV 5-07-1491-JAM-CMK, 2009 WL 1456633, at *6 (E.D. Cal. May 22, 2009)(holding that act of officer in placing inmate in wrist lock in response to inmate becoming aggressive and confrontational was not excessive force, but was appropriate level of force to regain control of Plaintiff).

**Accordingly, the undersigned recommends that Plaintiff's claim of excessive use of force by Defendant Crane when applying the transport wrist lock be dismissed.**

### C.  Second Incident - When Plaintiff allegedly received a black eye when he was placed on the ground:

Plaintiff conceded, after watching the video of the incident, that he did go to the ground to his buttocks first, rather than his initial testimony where he stated that he was "slammed to the ground" onto his stomach.  Plaintiff testified that he received the black eye when he was on his stomach.  In Chambers v. Pennycook, 641 F.3d 898 (8th Cir. 2011), the Eighth Circuit held that although "relatively minor scrapes and bruises" and a "less-than-permanent aggravation of a prior shoulder condition" are to be considered de minimis injuries," id. at 906, quoting Wertish v. Krueger, 433 F.3d 1062, 1067 (8th Cir. 2006), evidence of only de minimis injury does not necessarily foreclose a claim of excessive force under the Fourth Amendment.  "The appropriate inquiry is 'whether the force used to effect a particular seizure is reasonable.'" Id., quoting from Graham, 490 U.S. at 395 (emphasis added).  The Court in Chambers continued:

> A *de minimis use of force* is insufficient to support a claim, see Hunter, 219 F.3d at 832, Curd v. City Court, 141 F.3d 839, 841 (8th Cir. 1998), and it may well be that most

-17-

plaintiffs showing only *de minimis* injury can show only a corresponding *de minimis* use of force. The degree of injury is certainly relevant insofar as it tends to show the amount and type of force used. (citations omitted). But it is logically possible to prove an excessive use of *force* that caused only a minor *injury*, and a rule that forecloses a constitutional claim in that circumstance focuses on the wrong question.

Chambers, 641 F.3d at 906.

Plaintiff contends the only injury he suffered from being placed on the ground is a black eye, and even if the Court were to find the black eye to be a de minimis injury, the real question is whether Defendant Crane's use of force was reasonable. Viewing the facts in a light most favorable to Plaintiff, it is not disputed that Plaintiff slammed his head against the wall two times while facing the wall in an attempt to calm himself down, that he was upset, and that all of the individuals involved were raising their voices. It is reasonable to conclude that emotions were high, and that Defendant Crane was trying to maintain control of Plaintiff for his safety and the safety of others. Further, the video of the incident (Defs.' Ex. 3) does not reflect that any force was used against Plaintiff other than turning him over onto his belly and holding him down. The Court, therefore, finds that no unreasonable force was used. Cf. Richardson v. Ray, No. 7:10-CV-00078, 2012 WL 967071, at *5 (W.D. Va. Mar. 21, 2012)(two small cuts, welt, and black eye were de minimis injuries that evinced the use of de minimis force; officers had no alternative but to wrestle inmate into restraints on the floor because inmate refused orders to submit to restraints); Barber v. Santa Maria Police Dept., No. CV 08-6273-DMB MLG, 2010 WL 5559708, at *8 (C.D. Cal. Sept. 1, 2010)(relatively de minimis nature of arrestee's injuries – slight black eye – demonstrated that amount of force used by officers was reasonable given that arrestee was ignoring commands and physically resisting officer's attempt to restrain him), adopted, 2011 WL 73419 (Jan. 5, 2011).

-18-

**Accordingly, the undersigned recommends that Plaintiff's claim of excessive use of force by Defendant Crane when Plaintiff was taken to the ground be dismissed.**

**D.   Third Incident - When Defendant McCranie bent Plaintiff's wrist down while escorting him to the nurse's station:**

Plaintiff testified that he was not resisting when Defendant McCranie pressed his wrist down while he was in handcuffs and being escorted to the nurse's station, and that he dropped to his knees when Defendant McCranie applied the pressure.  Plaintiff testified that both of his wrists were swollen when he went into the nurse's station.  Plaintiff also testified that he suffered only a bruise from Defendant McCranie's actions, and that the bruise lasted for a week and a half.  Considering the evidence in a light most favorable to Plaintiff, the Court believes the bruised wrist constituted a de minimis injury, evincing only a de minimis use of force.

**Accordingly, the undersigned recommends that Plaintiff's claim of excessive use of force by Defendant McCranie when being transported to the nurse's station be dismissed.**

**E.   Fourth Incident - Placement of Plaintiff in the suicide smock:**

Plaintiff acknowledged that he was belligerent and resisting being placed in the smock. When asked why Defendants moved him over to the table, he stated he was "probably wiggling" and making it difficult for them to put the smock on him.  The testimony revealed that the reason Defendant McCranie decided that Plaintiff needed to be placed in the smock was to prevent Plaintiff from further injuring himself, based upon Plaintiff's previous actions in banging his head against the wall and his anger level.  There is no question that the decision to place Plaintiff in the smock was reasonable.  It was also reasonable for Defendants to believe it was necessary to use a certain amount of force to disrobe Plaintiff, and place him in the smock, and there is no

-19-

evidence to support Plaintiff's contention that unreasonable force was used in placing him in the smock.  While Plaintiff's wrist may have been injured on the table during the struggle, this would not have occurred had Plaintiff not been resisting.  The undersigned believes that Defendants applied reasonable force in a good-faith effort to compel compliance with their orders, maintain and restore jail discipline, and subdue Plaintiff.  Cf. Lewis v. Stellingworth, No. 07-CV-13825, 2009 WL 1384149, at *8 (E.D. Mich. May 14, 2009)(holding that deputies used good-faith effort to maintain or restore discipline when inmate refused order to strip to be placed in suicide smock and force was thereafter applied).

**Accordingly, the undersigned recommends that Plaintiff's claim of excessive use of force when being placed in the suicide smock be dismissed.**

**F.  Official Capacity claims against remaining Defendants:**

In Brockinton v. City of Sherwood, 503 F.3d 667 (8th Cir. 2007), the Eighth Circuit set forth the relevant law regarding official capacity claims:

> A suit against a governmental actor in his official capacity is treated as a suit against the governmental entity itself.  Hafer v. Melo, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991)(citing Kentucky v. Graham, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)).  A governmental entity cannot be held vicariously liable for its agent's acts under § 1983.  Monell v. Dep't of Soc.Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  Rather, a plaintiff must identify a governmental "policy or custom that caused the plaintiff's injury" to recover from a governmental entity under § 1983.  Bd.of the County Comm'rs v. Brown, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)(citations and quotations omitted)....."This circuit has consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim."  McCoy v. City of Monticello, 411 F.3d 920, 922 (8th Cir. 2005).

Id. at 674.

The undersigned has concluded that Plaintiff was not subjected to any incidents of

-20-

excessive force by Defendants.  Accordingly, Defendants cannot be held liable in their official capacities based on any policy or custom theory.

   **The undersigned, therefore, recommends that Defendants' Motion for Summary Judgment be granted on the Plaintiff's claims against Defendants in their official capacities and that these claims be dismissed.**

**IV.    Conclusion:**

For the reasons stated above, the undersigned recommends that:

Defendants' Partial Motion for Summary Judgment (Doc. 32) be GRANTED, and that Plaintiff's claims against Defendant Chambers in his individual capacity and all Defendants in their official capacities be DISMISSED WITH PREJUDICE.

Plaintiff's claims against the remaining Defendants in their individual capacities be DISMISSED WITH PREJUDICE, as they do not present any issues triable to a jury and fail as a matter of law.

   **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

IT IS SO ORDERED this 25th day of May, 2012.


   /s/ Erin L. Setser
   HONORABLE ERIN L. SETSER
   UNITED STATES MAGISTRATE JUDGE

-21-